AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original     ☐



CLERK'S OFFICE
A TRUE COPY
Jul 11, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Wisconsin

| In the Matter of the Search of | ) | |
| --- | --- | --- |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. **25-M-451 (SCD)** |
| 430 Bunker Hill Drive, Brookfield, WI 53005, White 2022 | ) | |
| Toyota Rav4, WI license plate ANY8896 and Silver 2010 | ) | |
| Toyota Yaris, WI license plate 703ZCS, as more fully | ) | |
| described on Attachment A | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the    Eastern District    District of      Wisconsin
*(identify the person or describe the property to be searched and give its location)*:

    See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

    See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before    7-25-25    *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to   Magistrate Judge Stephen C. Dries   .
                                                           *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    7-11-25 9:50 am

                                            *Judge's signature*

City and state:    Milwaukee, WI                    Stephen C. Dries, U.S. Magistrate Judge
                                                              *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

1.      TARGET RESIDENCE associated with ERIKSEN, located at **430 Bunker Hill Drive, Brookfield, WI** depicted below; the residence is a single family, two-story home with white siding and a front door that faces West. The residence has an attached garage facing North. Below is an image that further identifies the residence.



2.      TARGET CELL PHONE associated with ERIKSEN

3.      All electronic devices associated with ERIKSEN

4.    The person of Calvin ERIKSEN, DOB: 08/31/1978 as depicted below



5.    White 2022 Toyota Rav4 bearing WI license plate ANY8896

6.    Silver 2010 Toyota Yaris bearing WI license plate 703ZCS

**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED**

1.      Any computer(s), computer hardware, computer software, removable digital media, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be, or are used to:  visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information pertaining to an interest in child pornography or child erotica. Computer as used in this warrant includes mobile phones and smartphones.

2.      Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

3.      Any and all notes, documents, records, or correspondence, in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, passwords, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C.§ 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C.§ 2256(2).

4.      Any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.     Any and all address books, names, and lists of names and addresses of individuals who may have been in communication by use of the computer or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means, including but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and

electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.     Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

11.     Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

13.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

14.     Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic

messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15. Any and all notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16. During the execution of the search of the Subject Premises described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of the owner of the device(s) to the fingerprint scanner of the device(s) found at the premises; (2) hold the device(s) found at the premises in front of the face of owner of the device(s) and activate the facial recognition feature; and/or (3) hold the device(s) found at the premises in front of the face of the owner of the device(s) and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.



CLERK'S OFFICE
A TRUE COPY
Jul 11, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
430 Bunker Hill Drive, Brookfield, WI 53005, White 2022 Toyota )
Rav4, WI license plate ANY8896 and Silver 2010 Toyota Yaris, WI )
license plate 703ZCS, as more fully described on Attachment A )

Case No. **25-M-451 (SCD)**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Eastern_____ District of _____Wisconsin_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C.§ 2252(a)(2) | Receipt/Distribution of child pornography |
| 18 U.S.C.§ Section 2251 | Production of child pornography |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Harleen Kaur*
_____
*Applicant's signature*

Harleen Kaur, Special Agent , HSI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date: ___7-11-25___

_____
*Judge's signature*

City and state: Milwaukee, WI

Stephen C. Dries. U.S. Magistrate Judge
_____
*Printed name and title*

**<u>AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT</u>**

I, Harleen Kaur, being duly sworn, depose and state as follows:

**<u>INTRODUCTION AND AGENT BACKGROUND</u>**

1.     Your affiant has been employed as a Special Agent with Homeland Security Investigations ("HSI") since September 2022. Among my responsibilities as an HSI Special Agent, I am trained and empowered to investigate crimes against the United States, as more fully described in Titles 8, 18, 19 and 21 of the United States Code, amongst others. This includes investigating crimes against children, particularly offenses involving child pornography and the exploitation of children, including but not limited to matters related to the sexual exploitation of minors, Internet child pornography, and offenses in violation of Title 18, United States Code, Sections 1470, 2422, 2251, 2252, 2252A, and 2422 et. seq. I have attended and received training in this area of law enforcement, and have both personally investigated, as well as assisted, in investigations involving the exploitation of children.

2.     From my experience with investigations involving sexual exploitation of children, I am aware of common methods individuals use to sexually exploit children online. I have participated in all aspects of exploitation investigations, including physical/electronic surveillance, execution of search warrants, undercover operations, analysis of phone and financial records, and arrest of suspects that are exploiting children online. Your Affiant is assigned to the Illinois Internet Crimes Against Children (ICAC) Task Force and has worked investigations involving the online sexual exploitation of children which have included both domestic and international investigations.

3.     This affidavit is made in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to authorize the search the residence located at 430 Bunker Hill Dr in Brookfield, WI (herein after TARGET RESIDENCE), cell phone of Calvin

ERIKSEN (herein after TARGET DEVICE), all electronics associated with ERIKSEN, and two vehicles registered to ERIKSEN: white 2022 Toyota Rav4 bearing WI license plate ANY8896 and silver 2010 Toyota Yaris bearing license plate WI 703ZCS. The TARGET RESIDENCE, two vehicles, and electronics of ERIKSEN will be further referenced Attachment A of this affidavit. The location to be searched will be described in more detail in Attachment A of this affidavit.

4.      Your Affiant believes the facts and circumstances set forth herein establish probable cause that a crime has been or is being committed and that a search of the identified location and/or the person of ERIKSEN for the items and information detailed in Attachment B will result in the discovery of evidence which shows or tends to show a crime has been committed or that a particular person has committed a crime.

5.      Your Affiant also submits that there is probable cause to believe that ERIKSEN is, or has committed, crimes of possessing and distributing child pornography, in violation of 18 U.S.C. § 2252, and production of child pornography, in violation of 18 U.S.C. § 2251, and evidence relating to these crimes, more particularly described in Attachment B, can be found at the subject premises.

6.      Because this affidavit is being submitted for the limited purposes of applying for a search warrant, your Affiant has not included each and every fact known concerning this investigation.  It would be nearly impossible to include all known factual information in this affidavit.  Instead, your Affiant has provided a general overview of the investigation and has set forth only the specific facts necessary to establish probable cause.  Where statements of others are set forth in this affidavit, they are set forth in substance and are not verbatim.  The information contained in this affidavit is based on your Affiant's personal knowledge and information gained

2

through training and experience, in addition to information obtained by other law enforcement

agents and documentary evidence.

## **DEFINITIONS**

7.      The following definitions are applicable to this Affidavit and Attachment B to this

Affidavit:

a.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

b.      "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

c.      "Computer" refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device." *See* 18 U.S.C. § 1030(e)(1).

d.      The term "hyperlink" refers to a term in computing where a given link provides access to another location by clicking or accessing the link. An Internet address auto-formatted by Microsoft Word (e.g. http://www.google.com) is an example of a hyperlink. The recipient of the address (in this case, the reader of this affidavit if reading on a digital device) can click on the text of the address, which "links" to the target website (Google.com).

e.      The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

3

f.      An "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers ("ISPs") control a range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

g.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

h.      "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

i.      The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); mechanical form (including, but not limited to, phonograph records, printing, typing); or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media Cards ("MMCs"), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

j.      "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals or pubic area of any person.

k.      "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other

4

electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## **PROBABLE CAUSE**

8.     On March 18, 2025, Homeland Security Investigations (HSI) Milwaukee received a CyberTip (CT), CT205234755, from National Center for Missing and Exploited Children (NCMEC). CT205234755 was submitted by electronic service provider MediaLab/Kik after the Kik user "anarurin99" uploaded four files of apparent child pornography on between January 13, 2025, and January 17, 2025, from IP address 172.3.213.188 & 172.59.98.98. The user's email address was listed as kev.svensen@gmail.com. The CT also noted that one of the transmitted files was a video that suspect sent to another user via private chat message. The video was distributed on January 13, 2025, at about 01:24:43 UTC, and the suspect's IP address at that time was 172.59.98.98, The CT also provided geo-lookup information on the suspect's IP addresses which were provided as follows: 172.59.98.98 (Port: 62202) Login 01-13-2025 01:24:43 UTC. The CT also provided geo-lookup information on the suspect's IP addresses which "geo-located" to Milwaukee, WI or Froedtert Memorial Lutheran Hospital

9.     The CT also provided geo-lookup information on the suspect's IP addresses which were provided as follows:

IP address 209.215.133.17, geolocated to Milwaukee, Wisconsin, with Internet Service Provider (ISP) "AT&T Internet/Froedtert Memorial Lutheran Hospital"

IP address 172.59.96.23, geolocated to Milwaukee, Wisconsin, with ISP T-Mobile

IP address 172.59.98.48, geolocated to Milwaukee, Wisconsin, with ISP T-Mobile

IP address 209.215.133.1, geolocated to Milwaukee, Wisconsin, with Froedtert Memorial/Lutheran Hospital

5

IP address 72.3.213.188, geolocated to New Berlin, WI with ISP AT&T Internet

10.     On March 18, 2025, your affiant conducted deconfliction in Internet Crimes Against Children (ICAC) database and found that CT205234755 is directly related to CyberTip (CT) 196082469 and the subsequent HSI case in West Palm Beach, FL. Your affiant received background information on the related HSI case and the events that led up to the identification of "anarurin99".

## BACKGROUND INFORMATION ON HSI WEST PALM BEACH, FL

11.     In August of 2023, a Homeland Security Investigations (HSI) West Palm Beach (WPB) undercover Special Agent (herein referred to as "the UC") acted in an undercover capacity online on the mobile messaging application "Kik[1]" to detect and investigate violations of federal law related to the sexual exploitation of children. At all times relevant to this affidavit, the UC was in the Southern District of Florida. The UC assumed the persona of a 29-year-old female with an 8-year-old daughter, herein referred to as Child1. The UC was monitoring numerous chatrooms including those created for individuals to discuss their interests in "taboo" sex, family incest, child pornography, and the like, to combat the sexual abuse of child and distribution of child pornography.

12.     On or about August 4, 2023, at about 6:55 P.M., the UC received a private message from Kik user "anarurin69" (display name "Anaru Rin"). The user stated, "Are you into letting

---

[1]     Kik is "the first smartphone messenger with a built-in browser." Kik Messenger allows users to "talk to your friends and browse and share any web site with your friends on Kik." According to their website, Kik Messenger, a free service easily downloaded from the Internet, has become the simplest, fastest, most life-like chat experience you can get on a smartphone. Unlike other messengers, Kik usernames - not phone numbers - are the basis for Kik user accounts, so Kik users are in complete control of with whom they communicate. In addition, Kik users can exchange images, videos, sketches, stickers and even more with mobile web pages.

guys play with you and your daughter? M 44 dad btw". The UC did not respond. The same user messaged again on August 5, 2023, "How are you and your daughter?"

13.     On August 6, 2023, the UC responded and introduced herself as a 29-year-old female in the United States with an 8-year-old daughter and said, "She hasn't been with any men yet, only me. Where u from?" The user stated he was from the United States and said, "I think that mom and daughters together is a beautiful thing." The UC asked him what he was looking for. On or about August 7, 2023, he replied, "I'd love to have a threesome with a mom and her young daughter".

14.     On August 7, 2023, the Kik user told the UC that he was from Wisconsin, and the UC stated she and her child were from Florida. On the same date, the user stated, "Would you be open to letting me fuck you and your daughter together?" The UC said that she would have to feel comfortable trusting him first, and asked him if he was "being for real though or just fantasy talk?" The user responded with sending a photo of himself and said "Bit of both. It's a fantasy until it happens for real". The photo depicted a middle-aged white male with what appeared to be brown hair and blue eyes, wearing a dark jacket. The UC said, "I understand fantasy but if that's what it is for u, that's cool. I'm just not into fantasy chatting". The user replied, "I want it for real. But obvious we need to be comfortable with each other".

15.     The UC and Kik user continued communication via Kik. The user stated he did not have previous experience with a child as young as the UC's daughter, but "mostly age 13-14 girls". He told the UC that he thought the first steps they should take would be for the UC to have sex with him while Child1 was there, "then we can start with touching and oral sex slowly." The UC informed him that she was not looking for a "hook up" for her. The user responded that it "takes time to build up to sex with her" (e.g. Child1).

7

16.     On or about August 9, 2023, the Kik user told the UC that he is a physician, specifically a surgeon. Over time he would specify that he did liver surgeries. The UC told him that he had a cooler job than her, to which he said, "Moms that love their young daughters are way cooler than my job. Especially if you're open to letting her be with me too at her age". The UC stated that she has to be careful about which man to pick for Child1, and that she wants Child1 to be "safe and cared for and no injuries." The Kik user said, "I want the same. She should enjoy it and want to do it". The UC asked him again what he would like to do, and he stated, "Well I'd love to have sex with you both. Probably have kids with you both as well. Have an ice family with a unique bond".

17.     On August 9, 2023, HSI West Palm Beach HSI agent conducted facial recognition on the picture that the Kik user had sent them. Facial recognition positively identified the Kik user to be Calvin Martin ERIKSEN, date of birth August 31, 1978, Calvin.Eriksen@gmail.com and to be a surgeon at a children's hospital. ERIKSEN was associated with phone 608-658-8962 and 414-805-5800.

18.     The Kik user then stated he would love to be Child1's "first guy." The UC asked him what he would like to do or teach her, and he stated, "Well I'd like to know what you have done with her. Im guessing touching and oral sex stuff. Use any toys with her? Obviously oral sex with a guy is different than with a girl". He also said, "I like ass eating, I'd love to lick both your and her asses. Would be nice to start teaching her how to lick and suck cock. Do you finger her pussy?" The UC stated she had not "gone all the way in yet with [her] finger". The Kik user stated, "That's a good place to start. Getting her used to fingers in her pussy and ass. Of course slowly gently and with lots of lube. I want her to love the feeling of something inside her. Eventually

8

working up to more than one finger, and then to my cock as she is ready. Of course always together with you."

19.     The UC responded, "That's so hot". The Kik user stated, "Yes. Especially when she's so little but loving dick inside her." He then added, "And tbh, if you have periods at age 11-12, it means you're body is ready to be pregnant. Starting to learn about sex earlier than that is not the crazy".

20.     On or about August 10, 2023, the Kik user stated his name was "Kevin". He also stated he has a daughter who was almost 22 years old, and a wife who was an at-home mother, which is why he was unable to sexually molest his daughter. On the same date, the user stated that he would love to be with the UC and Child1, and that they "need to figure out how to start together". He said that he wanted to make sure that he and the UC want the same thing, and that the UC would be open to him having sex with both her and Child1. The UC stated that she wanted to lay out rules, to include not causing injuries to the child, and that the user must wear a condom when having sex with Child1. He said, "At first of course. But if we are comfortable I'd love to be able to creampie her and you both". The UC expressed concerns about Child1 contracting diseases, to which he said, "I don't have any diseases and can make sure I'm tested for you both".

21.     He then said, "Also I do like anal sex and would want to do it with both of you". The UC asked him if he thought Child1 could do that. He said, "Yes. I think it takes some time and training. I love to eat ass. So licking and gently push my tongue into both your and her assholes. Fingering them too. Getting her used to the feeling. Same thing you would do for her pussy. I'm sure seeing my do anal with you would help her understand and be interested in it". The user also stated "I will teach her about getting her ass eaten. But her learning to suck my cock will be a new thing to learn. Will help having you show her how to suck". He added, "Eventually learn to

swallow cum, but maybe first let her lick my cum off of you. I think she'll look so cute with my cock in her mouth. At least get her used to the taste of cum. Alternatively I could cum in your pussy and we could let her lick my cum out of you. Maybe once she's comfortable I can rub my cock on her clit and pussy lips. Then shoot my cum on her cute lil pussy. You or I could lick her pussy clean".

22.    The Kik user stated that he may be able to travel in Florida in January 2024 to engage in such acts. He said that at his job, they plan their vacations and time off several months in advance.

23.    On or about August 15, 2023, the user and the UC were discussing their day at work. Later in the evening, the UC stated she was done working for the day and was back home with Child1. The user stated, "You should make her lick your pussy while we chat".

24.    Anarurin69's description of sexual acts he wanted to perform on Child1 and desire to travel the Southern District of Florida to engage in those acts continued through December 2023.

25.    The user also offered that he had experience with the daughter of a single mother he was dating, when her 14-year-old daughter overheard them having sex. Several days later, the teenager asked him if she could see his "dick", so "I told her I'd showed it to her but she had to promise to keep it secret". He stated, "I was so hard when I pulled it out floor [for] her. I let her touch it and stroke it a little. I told her if she keeps going, that I'd want to do naughty things to her." He claimed that he told the girl to take her clothes off, and "I started rubbing and playing with her pussy while she stroked me. I licked and fingered her until she came". This occurred while her mother was at work. He added, "I love how young pussy tastes" and "I had her jerk me and cam on her tits and tummy". The Kik user alleged that he told the girl they could continue to try things as long as she kept it a secret, so they would continue to meet after school before her mother

10

came home from work. He said, "I taught her about sex. Blow jobs. Pussy sex and anal sex too". They continued sexual activity for four years until she moved way for college.

26.     On or about October 31, 2023, the Kik user stated "I think if we lived closer we'd have already met". On December 1, 2023, the Kik user stated "If we lived in the same town, I'm sure Child1 would be used to my cock insider her by now". The UC did not receive further communication from him.

27.     In August 2023, HSI West Palm Beach served a summons to Kik for subscriber information for the user account anarurin69. Kik provided that the account was being operated on an iPhone, and the email address associated to the account was kev.svensen@gmail.com. Kik also provided the user's Internet Protocol (IP) activity log. A second summons to Kik in October 2023 produced the same results.

28.     On or about July 1, 2024, the UC was continuing to monitor numerous taboo chatrooms when she entered a Kik chatroom named "Bad Moms". Upon entering, she found that the Kik user anarurin69 was a current member of the chatroom. This was the first time the UC encountered him since December 2023. The UC then sent him a private message on the same date stating, "Omg hey! Just joined a room and saw ur here too! I haven't heard from u in forever. How are u".

29.     On or about July 2, 2024, at about 5:21pm, the Kik user responded, "I'm good baby. How are you two?" The UC said that they have been great, and that she was worried something happened to him because it had been a while since they communicated. The user stated, "Things just got so busy". He asked what was new with them, and the UC said, "It's summer vacation school is out so a lot more play time". He responded, "Wish I could play with you both" and "I'd love to train your daughter to enjoy anal". The UC stated that she thought that was going to happen

previously. He replied that he had hoped so, but "work things got crazy. If only you both lived closer". The UC said she did not have enough money to travel up north.

30.     The Kik user responded, "I'd love to get you pregnant with another daughter". The UC asked him what he would like to do with her, and he said "Well she needs to learn to suck my cock and do anal sex. Start train her pussy too. I'd love to get her pregnant very young." The UC said she had not tried anal sex with Child1 yet because she thought it would be harder to do that. The user responded, "Assholes stretch more easily than pussy". He asked if the UC has used any toys in the child's vagina yet and said he would love to watch the UC "playing with her". He added, "I'd love to eat both your cute lil assholes".

31.     Still on July 2, 2024, at about 8:01pm, the Kik user stated that he would like to see a normal photo of the UC and Child1. The UC asked him to send her one in return. He then sent the UC a photo of himself. The photo depicted a middle-aged white male with brown hair and eyeglasses. He appeared to possibly be wearing medical scrubs. The male resembled the same male in the photo that the user sent to the UC in August 2023. The UC then sent a photo of herself standing next to the purported Child1. He responded, "So sexy!!" and "You must look so amazing naked together".

32.     The UC asked him how old he was again. At about 8:09pm he responded, "I'm 45" and sent the UC another photo. The photo depicted an adult white male from the waist down, laying on a bed. He was nude and was holding his erect penis. The UC responded with asking him if he thinks he could fit inside of Child1. He replied, "Eventually" and "I'm sure you'll both enjoy it". The UC stated, "I approve of your dick for her". At 8:16pm, the user replied, "Thanks. I'd love you to show it to her. See what she thinks". The UC said, "Omg really?" He said "Yes". The UC asked him what he would like for her to tell Child1 when she shows him the photo of his penis.

He stated, "Tell her that you would like you and her to play with my cock". He then stated that he was driving to work and may lose connection. This concluded his communication on this date. Also note that on this date, Kik showed that this user's account had been active for 461 days.

33.     Then, on July 3, 2024, at about 8:46pm, the Kik user messaged the UC again stating, "Good morning baby!" and "Did you show my cock pic to your daughter". The UC informed him that she had not shown it to her yet because Child1 had a sleepover last night at a friend's house because Child1 and her friend were turning 9 years old this summer. He responded, "Has her friend every played with you"? The UC said no, and asked "Still want me to show her your cock tonight when she's home"? He responded "Yes". The UC stated she would let him know what the child says. The Kik user stated that he would be online tonight.

34.     The UC asked him if he was actually serious about meeting her and Child1, or if it was just nice for him to think about. He stated, "I'd love to meet you both" and "I really do want to have sex with you and Child1".

35.     The UC also asked him what types of videos he likes. At about 10:13am he stated, "I do love seeing young girls doing anal". He also said, "I've seen some pretty young girls doing it and they seem to be able to handle it surprisingly well" and "It will be so hot when Child1 comes asking me to fuck her cute lil butt".

36.     The last message the UC received from the Kik user was at 12:07pm on July 3, 2024. When she tried to respond to him later that afternoon, she was unable to respond and it appeared that his account had been banned from Kik. Therefore, the UC lost communication with the user.

37.     HSI West Palm Beach contacted the National Center for Missing and Exploited Children (NCMEC) and inquired if any CyberTips had been generated on Kik account anarurin69.

NCMEC provided HSI with CyberTip (CT) 196082469 which they received on July 3, 2024 at 19:45:15 UTC. The CT was submitted by electronic service provider MediaLab/Kik after the Kik user "anarurin69" uploaded two files of apparent child pornography on June 22, 2024 at 00:15:22 UTC. The user's email address was listed as kev.svensen@gmail.com, and numerous IP addresses were provided on the CT. The CT also noted that one of the transmitted files was a video that suspect sent to another user via private chat message. The video was distributed on June 22, 2024 at about 00:15:22 UTC, and the suspect's IP address at that time was 209.215.133.1, Port 33387. The CT also provided geo-lookup information on the suspect's IP addresses which "geo-located" to Milwaukee, WI or Froedtert Memorial Lutheran Hospital Campus, located at 900 N 92nd St, Milwaukee, WI 53226.

38.     HSI West Palm Beach conducted open-record search and found that Froedtert & Medical College in Wisconsin lists on its website the photo and information for Dr. Calvin Martin Eriksen who is a transplant surgeon specializing in kidney and liver transplantation at the Transplant Center – Center for Advanced Care – Froedtert Hospital, located at 8900 West Doyne Ave., Milwaukee, Wisconsin. The information showed that this surgeon sees patients of any age to include infants, children, adolescents, adults and seniors. A photo of the surgeon depicted a middle-aged white male, who appeared to be the same male in the two photos that the Kik user anarurin69 sent of himself to the UC. A search of "Calvin Martin Eriksen" on the Internet also revealed that Dr. Calvin Martin Eriksen is listed under physicians for the Children's Hospital and Health System of Children's Wisconsin.

39.     On August 9, 2023, HSI West Palm Beach conducted a search of public and law enforcement databases which led to the identification of 45-year-old Calvin Martin ERIKSEN who

14

has a date of birth of August 31, 1978. The address listed on his Wisconsin driver's license is listed as 1550 Rivers Bend, #202, Wauwatosa, Wisconsin 53226.

## WISCONSIN CYBER TIP CT205234755

40.     Based on my training, experience, and knowledge of the investigation, your affiant believes that, due to the similarities in the Kik usernames, recovery email of kev.svensen@gmail.com, IP addresses pinging at Froedtert Memorial Hospital, that "anarurin69" and "anarurin99" are the same individual, Calvin Martin ERIKSEN.

41.     Your affiant conducted law enforcement database checks and found ERIKSEN has a recent address of 430 Bunker Hills Dr, Brookfield, WI 53005. Per Wisconsin Department of Transportation, this address was updated in March 2025 on ERIKSEN's driver's license E625-1137-8311-05.

42.     On March 21, 2025, your affiant found that the billing subscriber for utilities at 430 Bunker Hill Dr, Brookfield, WI is Calvin ERIKSEN and has been active since December 13, 2025.

43.     On March 22, 2025, your affiant received the summons return from AT&T for subscriber information IP address "172.3.213.188" used to upload and distribute images and video of child sexual abuse material. AT&T provided that the billing party of the IP address is Calvin ERIKSEN with a billing address of 430 Bunker Hills Dr, Brookfield, WI 53005. The account was created on 7-12-2016 with an account number of 153992951. The account email associated with the account is Calvineriksen@att.net and the phone number attached to the account is 608-658-8962 with another email address of Calvin.Eriksen@Gmail.com.

44.     On April 8, 2025, Honorable U.S Magistrate Judge Stephen C. Dries signed the search warrant for Kik useraccount "Anarurin99". Your affiant served the search warrant on Kik

15

for account "Anarurin99" the same day. On April 29, 2025, your affiant received the search warrant returns from Kik.

45.     On April 9, 2025, ERIKSEN was selected for a random inspection at the O'Hare International Airport in Chicago, IL by Customs and Border Protection (CBP). ERIKSEN stated the following information during the inspection. In sum, ERIKSEN is an organ transplant surgeon in Milwaukee, Wisconsin. ERIKSEN traveled to Prague, Vienna with his Japanese born wife and daughter. ERIKSEN's address is 430 Bunker Hill Dr, Brookfield, WI 53005 and his active cell phone number is 608-588-8962. He provided his email address as Calvin.Eriksen@gmail.com. ERIKSEN provided his iPhone 12 Pro with model number MGKM3LLA for a basic border inspection. The basic inspection was found to have negative results, and the iPhone was returned to ERIKSEN subsequent to the inspection.

46.     Per review of the Kik search warrant returns, your affiant found the following. There were 358 pictures and 66 videos. A review of the numerous videos and pictures of child sexual abuse material (CSAM) found that "Anarurin99" distributed CSAM materials to additional users on various group chats. A sample description of the content are as follows:

**File Name**: 10f9cd7d-4870-474a-9c6f-42516eb12428

**Descriptio**n: an image of a pre-pubescent minor female, fully unclothed except wearing white stockings up to her thighs, sitting on a fully erect male penis being seemingly penetrated. The minor female does not have any breast development.

**File Name:** 23ea41e4-71f0-4bb6-8a50-9e27594336f5.jpeg

**Description:** an image of a minor female, fully unclothed, sitting on a fully erect male penis, being seemingly penetrated. The minor female is sitting facing away from the male **therefore lack**

of pubic hair and breast development is difficult to confirm from the image however the posterior physicality of the minor lacks pre-teen features.

**File Name:** 7ccb7327-d898-468a-9a80-739360fa0674.mp4

**Description:** a video, 9 seconds long, of an adult male engaging in vaginal sex with a minor female that is lying face down on a pink blanket. The minor female is wearing a pink bow and appears to be school aged, approximately 7 to 8 years old. Lying down next to her is another minor female observing **the sexual intercourse.**

**File Name:** 0d889f48-1493-4a-9a-9d78-18083393052a.mp4

**Description:** a video 9 seconds long, an adult female is performing fellatio on an adult male while a baby is sucking on the adult female's breast.

**File Name:** 5f7fc6fa-439b-bacd-37391cf1ce9d.mp4

**Description:** a video approximately 36 seconds long in which an adult female and adult male are having vaginal intercourse while a dog is licking the adult penis

47.     A review of the chat messages reveal th following:

i. There were numerous messages in group chats as well as private chats with individuals in which ERIKSEN consistently introduces himself as, "M 46 Milwaukee"; "I am technically, Wauwatosa", etc. Per my experience and training, "Anarurin99" is stating that he is a male, 46 years old, and resides in Milwaukee.

ii.     On January 14, 2025, "anarurin99" sends a group message stating, "I am a surgeon. I do liver surgeries. Yes surgeries for liver cancer and other liver conditions, including liver transplants".

iii.     On November 05, 2025, "anarurin99" has a conversation with user "1familyof04_ead" consisting of "anarurin99"'s interest in having sex with a mom and her young

17

daughter of 7 years of age, "I'd love to fuck a mom and her daughter together"; "I really want to do it with a girl your daughters age". "Anarurin99" asked user 1familyof04_ead, "Do you often share your daughter with other guys; 1familyof04 replied, "I'm open to it".

      iv.    On November 18, 2024, "anarurin99" has a private conversation with user "2hott42_ojp" consisting of "anarurin99"s interest in having sexual intercourse with a 7 year old, "Maybe your youngest can suck my cock while me and the oldest eat your sexy holes."

      48.    On July 7, 2025, HSI Special Agents conducted surveillance at 430 Bunker Hill Dr, Brookfield, WI 53005. At approximately 6:49pm, agents observed a White Toyota Rav4 bearing WI license plate ANY8896 come up the driveway of 830 Bunker Hill and open the garage. ERIKSEN stepped out of the driver's side of the vehicle, walk inside the garage, and opened the second attached garage. ERIKSEN walked back to his vehicle and moved his vehicle inside the garage. While the garage was open, there was another silver vehicle visible to law enforcement. The vehicle matched the description of a silver 2010 Toyota Yaris bearing WI 703ZCS that is known to law enforcement as being registered to ERIKSEN at 430 Bunker Hill Drive, Brookfield, WI 53005. Per WI Department of Transportation, the White Toyota Rav4 bearing WI license plate ANY8896 is registered to ERIKSEN at the TARGET RESIDENCE.

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

      49.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the TARGET RESIDENCE, in whatever form they are found.  One form in which the records might be found is data stored on a computer or cellular telephone's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

18

50.     *Probable cause.*  I submit that if a computer, cellular phone including TARGET DEVICE or storage medium is found on the TARGET RESIDENCE, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer or cellular phone, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

51.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files and information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how electronic devices at the TARGET RESIDENCE or located on ERIKSEN (including TARGET DEVICE) were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the TARGET RESIDENCE because:

52.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files and information that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how electronic devices at the TARGET RESIDENCE or located on ERIKSEN (including TARGET DEVICE) were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the TARGET RESIDENCE because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record

20

information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.   As explained herein, information stored within a computer and other electronic storage media including cellular telephones such as the TARGET DEVICE may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.   In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.   The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.   Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.   For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.   Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.   Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.   For example, images stored on a computer may both show a particular

21

location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

53.   *Necessity of seizing or copying entire computers or storage media.*   In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.   Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.   Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.   This is true because of the following:

a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.   Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.   Storage media can store a large volume of information.   Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.     Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

54.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media (including cellular telephones and computers) that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## BIOMETRIC UNLOCK

55.     The warrant I am applying for would permit law enforcement to obtain from the display of physical biometric characteristics (such as fingerprint, thumbprint, facial, or iris characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

24

56.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices, and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to use.

57.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

58.     If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

59.     If a device is equipped with an iris recognition feature, a user may enable the ability to unlock the device through his or her irises. For example, Samsung offers an Iris Scanner, which uses the biometric information of an individuals' irises to identify the user.

60.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

61.     As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

62.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered within a certain period of time. Biometric features from other brands carry similar restrictions. Thus, in the event

26

law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

63.     Due to the foregoing, with respect to ERIKSEN and the TARGET DEVICE that will be seized from his person as well as any person who is located in the TARGET RESIDENCE during the execution of the search and who is reasonably believe by law enforcement to be a user of a biometric sensor-enabled device that falls within the scope of this warrant, it is requested that law enforcement personnel may (1) press or swipe the fingers (including thumbs) of the person to the fingerprint scanner of the device found at the premises; or (2) hold the device in front of the person's face to activate the facial and/or iris recognition features, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

64.     Based on the facts of the investigation detailed above in this Affidavit, coupled with my training and experience as an HSI Special Agent, I submit there is probable cause to believe that an individual at 430 Bunker Hill Dr, Brookfield, WI is using an electronic device connected to the internet to produce and distribute CSAM. As such, I submit there is probable cause to believe that in the residence located at 430 Bunker Hill Drive, Brookfield, WI 53005, more particularly described in Attachment A, there exist fruits, instrumentalities and evidence of violations of 18 U.S.C. § 2252 and 2251, as described in Attachment B.

## ATTACHMENT A

### Property to Be Searched

1.     TARGET RESIDENCE associated with ERIKSEN, located at **430 Bunker Hill Drive, Brookfield, WI** depicted below; the residence is a single family, two-story home with white siding and a front door that faces West. The residence has an attached garage facing North. Below is an image that further identifies the residence.



2.     TARGET CELL PHONE associated with ERIKSEN

3.     All electronic devices associated with ERIKSEN

4. The person of Calvin ERIKSEN, DOB: 08/31/1978 as depicted below



5. White 2022 Toyota Rav4 bearing WI license plate ANY8896

6. Silver 2010 Toyota Yaris bearing WI license plate 703ZCS

## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

1.      Any computer(s), computer hardware, computer software, removable digital media, computer related documentation, computer passwords and data security devices, videotapes, video recording devices, video recording players, and video display monitors that may be, or are used to:  visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography, child erotica, or information  pertaining to an interest in child pornography or child erotica. Computer as used in this warrant includes mobile phones and smartphones.

2.      Any and all computer software, including programs to run operating systems, applications (such as word processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications  programs.

3.      Any and all notes, documents, records, or correspondence,  in any format and medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, passwords, and handwritten notes) pertaining to the possession, receipt, or distribution of child pornography as defined in 18 U.S.C.§ 2256(8) or to the possession, receipt, or distribution of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C.§ 2256(2).

4.      Any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5.     Any and all address books, names, and lists of names and addresses of individuals who may have been in communication by use of the computer or by other means for the purpose of distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, through interstate or foreign commerce by any means, including but not limited to, by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.     Any and all notes, documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and

electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

10.     Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an Internet Service Provider.

11.     Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

13.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means, including by the United States Mail or by computer, any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

14.     Any and all documents, records, or correspondence, in any format or medium (including, but not limited to, envelopes, letters, papers, e-mail messages, chat logs and electronic

messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including, but not limited to, rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15.     Any and all notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16.     During the execution of the search of the Subject Premises described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of the owner of the device(s) to the fingerprint scanner of the device(s) found at the premises; (2) hold the device(s) found at the premises in front of the face of owner of the device(s) and activate the facial recognition feature; and/or (3) hold the device(s) found at the premises in front of the face of the owner of the device(s) and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.